[No. A065678. First Dist., Div. Two. July 15, 1996.]

ZUHAYR NIZAM-ALDINE, Plaintiff and Respondent, v.
CITY OF OAKLAND, Defendant and Appellant.

AL MASSO, Plaintiff and Respondent, v.
CITY OF OAKLAND, Defendant and Appellant.

COUNSEL

Jayne W. Williams, City Attorney, Randolph W. Hall, Assistant City Attorney, Robert J. Graham, Deputy City Attorney, Crosby, Heafey, Roach & May, John E. Carne, Paul D. Fogel and John F. Eyrich for Defendant and Appellant.

Charles O. Morgan, Jr., and Paul Kleven for Plaintiffs and Respondents.

OPINION

HAERLE, J.—

## I. INTRODUCTION

The City of Oakland (the City) appeals a judgment entered pursuant to a jury verdict holding the City liable for defamation and for placing plaintiffs in a false light. Plaintiffs and respondents, Zuhayr Nizam-Aldine (Aldine) and Al Masso (Masso) are licensed civil engineers allegedly accused by the City of conducting inaccurate and fraudulent boundary surveys of three parcels of property located in the Oakland Hills. The jury awarded Aldine $650,000 and Masso $125,000. The City contends the trial court committed constitutional error by instructing the jury that the City had the burden of proving that the allegedly defamatory statements were true.

We conclude the allegedly defamatory statements at issue in this case pertained to a matter of public interest. Therefore, the jury instruction requiring the City to prove these statements true violated the City's federal Constitution First Amendment rights. Because the erroneous instruction was prejudicial, we reverse the judgment.[1]

## II. STATEMENT OF FACTS

### A. Background: The 1927 Map and the 1954 Map

In 1980 Aldine purchased two lots in the Forestland Manor subdivision of the Oakland Hills, one located on Westover Drive and the other on Girvin Drive. Aldine performed retracement surveys on the lots in order to locate the original boundary lines. To conduct his surveys, Aldine relied primarily on a 1927 subdivision tract map (the 1927 map) that was referred to in the grant deeds for his property.

---

[1]Our resolution of the First Amendment issue makes it unnecessary for us to address the City's challenges regarding the sufficiency of the evidence to support the judgment and the damages awards.

The 1927 map was prepared by the original subdivider and was filed and recorded with the county recorder in 1928. The 1927 map contains dots which show the location of concrete monuments used by the original surveyors to measure boundary lines in the subdivision, and contains the following certification, signed by the surveyor: "I hereby certify that the subdivision shown on this map is made from my own survey of the ground, and that the monuments are of the nature and in the locations shown on the map."

Prior to conducting his surveys, Aldine reviewed additional documents and maps pertaining to the subdivision. According to Aldine, his research uncovered no reference to a monument map that had been prepared by the City in 1954 (the 1954 map). Unlike the 1927 map, the 1954 map was not referenced in Aldine's property deeds. Further, the City concedes the 1954 map was filed in the wrong place in the county recorder's office.

The 1954 map was based on surveys of Forestland Manor performed by the City from 1948 to 1954. The City claims that during these surveys it was unable to locate several allegedly crucial monuments referred to in the 1927 map. Therefore, the City concluded that original "control" and "corner" monuments were not set for major portions of the subdivision at the time the 1927 survey was conducted. Rather than placing monuments in positions shown on the 1927 map, the City set its own control monuments and plotted the new monument positions on the 1954 map.

## B. *The Dispute*

Aldine based his retracement surveys on monuments which he concluded were either originals or perpetuations of original monuments reflected on the 1927 map. Using these surveys, Aldine prepared plot plans which he submitted to the City along with building permit applications. Aldine's plans and applications were approved by the City. Construction, however, did not commence for several years.

In 1986 or 1987, Tami Genton, Aldine's then wife, purchased both lots from Aldine and also purchased an adjacent lot on Westover with the intent to build homes on each lot. Genton hired a general contractor and relied on Aldine to facilitate the permit process. Aldine also did soils reports, prepared updated plot plans for the first two properties and a new plan for the third lot, and performed all the survey work. The City approved the updated plans and issued new building permits. There was also evidence that City Inspector Steve Lewis inspected and approved the actual locations where the foundations were to be poured.

News of Genton's development plan for the Westover lots was not well received by neighbors Nellie and Curtis Ingraham who made several complaints to the City, challenging various aspects of Genton's plan. As a result, the City issued a stop-work notice and shut down work at the Westover sites on October 11, 1987. After discussing the Ingrahams' complaints with the City, Aldine asked Mohammed Aslam, a colleague and civil engineer, to confirm the accuracy of his surveys. Using 1927 monuments, Aslam confirmed Aldine's measurements were accurate.

City Surveyor Gary Faught inspected the Westover foundations. Faught did not use any maps to conduct this survey but instead based his measurements on a City monument designated as "A12" on the City's 1954 map (the A12 monument). Faught concluded the Westover foundations encroached seven to twelve feet into the public right-of-way.

The City asked Genton to obtain a new survey from an independent surveyor. Genton hired respondent Masso. Like Aldine, Masso used the 1927 map to conduct his survey.[2] Masso was not told about the 1954 map and found no references to it in the records and documents he reviewed. With no assistance from Aldine, Masso also located and relied on monuments he concluded were originals or perpetuations of originals reflected in the 1927 map. Although his measurements were not identical with Aldine's, Masso concluded that neither the Westover nor Girvin foundations encroached on the City's right-of-way.

While Masso was conducting his survey, the City informed Aldine that the 1927 map had been "superseded" by several other maps. Aldine hired a private surveyor named Gil Hayes to help him respond to the City's contention. Hayes contacted his acquaintance, City Surveyor Gary Faught. Faught gave Hayes a copy of the 1954 map and told Hayes no monuments were set at the time of the original survey in 1927. Faught also told Hayes that the A12 monument was located in the area where he would be surveying. Hayes admitted at trial that his own research had not uncovered any reference to the 1954 map.

Hayes used the 1954 map to do his field work. He then told Aldine the 1927 map was superseded and that the 1927 monuments Aldine claimed to have relied upon did not exist. Hayes confirmed Faught's finding that the Westover foundations encroached into the City's right-of-way. Hayes also surveyed the Girvin lot and concluded that foundation encroached as well. The City stopped work at the Girvin site on November 19, 1987.

---

[2]Masso testified at trial that he had used the monuments depicted on the 1927 map to perform three other boundary surveys in the Forestland Manor subdivision prior to his involvement in this case.

According to Aldine, when he returned to the lots after Hayes had been there, all of the 1927 monumentation was gone, leaving behind holes in the street pavement and at the corners of the lots. However, Aldine saw the A12 monument for the first time; it was painted bright red and located directly in front of one of the Westover lots. Aldine, Masso, and city inspector Steve Lewis had each been to the property prior to Hayes's visit and none had previously seen the A12 monument.[3]

## C. The Allegedly Defamatory Statements

The City continued to maintain that the 1927 map was not valid. Aldine and Masso both claim City officials threatened to report them to the California Board of Registration for Professional Engineers and Land Surveyors (Board of Engineers) for refusing to acknowledge the validity of the 1954 map and that City employees made a series of defamatory statements about their surveys. Aldine and Masso filed separate complaints against the City and three individuals employed by the City (Faught, Matsumoto and Wong) alleging defamation, false light, and intentional interference with prospective economic advantage.[4] At the consolidated trial, Aldine and Masso (jointly, respondents) supported their defamation claims by presenting evidence of statements made not just by the named individual defendants, but also by other employees of the City.

### 1. Statements by Named Defendants Wong, Faught and Matsumoto

City Engineer Joseph Wong sent a letter dated December 23, 1987, to Aldine which stated that Aldine's grading work "substantially deviat[ed]" from approved plans and that Aldine had used "improper surveying procedures." Wong was also accused of telling Curtis Ingraham, the disapproving neighbor, that Aldine's survey was improper and violated the Land Surveyor's Act and that the Westover foundations encroached on the City's right-of-way.

On March 7, 1988, Wong sent a letter to Genton's attorney enclosing an interoffice report prepared by Gary Faught. Wong's letter stated that Aldine and Masso claimed they relied on original 1927 monuments to conduct their surveys, but "that the monuments they refer to were never set in the original

---

[3]City Surveyor Gary Faught admitted that, after talking to Hayes, he did substantial repair work to the A12 monument that he had used as the basis of his measurements at the Westover sites. Faught claimed the A12 monument was damaged and needed repair so it could be utilized by Hayes.

[4]The City cross-complained against respondents and Genton alleging, among other things, misrepresentation, nuisance and trespass. The jury found against the City on its cross-complaint and that judgment is not at issue on appeal.

tract." Faught's report also stated the monuments had never been set, and that the City's position was not "that its monuments take precedence over those set forth in the original subdivision map, but that the latter never existed." Faught stated the 1954 map was the only monumented map of record.

City Engineer Tad Matsumoto allegedly told both Aldine and Masso that the City would report them to the Board of Engineers if they refused to change their surveys. Masso testified that Matsumoto characterized Aldine's survey as "either fabrication or fraud." Matsumoto denied making these statements. The City never reported Aldine or Masso to the Board of Engineers.

### 2. Statements by Other Individuals Employed by the City

City Building Inspector Steve Lewis posted a stop-work notice at the Girvin site. Aldine's contractor, Alex Beros, testified that when he asked Lewis why the work was being stopped, Lewis responded that there was a "problem" with the survey and it was "screwed up" or "fucked up." Beros testified that this information caused him to stop referring customers to Aldine for several years.

Mohammed Aslam testified that, in November 1987, an Asian-American city engineer whose name he did not know told him the engineer who did the surveys for the Westover and Girvin properties "was incompetent and he goofed up and he probably did some kind of fraudulent survey and they're going to report him to the Board."

Paul Tamm, president of the local homeowners association, sought information about the dispute from City Engineer Randy Lum. On December 1, 1987, Lum sent a "transmittal slip" to Tamm which stated that a letter "similar" to one attached to the transmittal slip would be prepared for Aldine. The attached letter informed an unidentified engineer that he had violated the City's grading ordinance, that the City considered this a "serious offense," planned to file "a complaint" with the Board of Engineers, and that the engineers' "violation" could result in "civil and/or criminal penalties."[5]

Marta de Pierris is a real estate broker who has known Masso since 1977 and made many referrals to him. De Pierris was considering using Masso on

---

[5]Tamm also spoke to City Engineer Joseph Wong about the dispute over the survey and was told that Aldine claimed he relied on old monuments which Wong stated no longer existed and could not have been found. Tamm discussed the dispute with other members of the Shepherd Canyon Homeowners Association. Three of the association's newsletters discussed the dispute, although Aldine's name was not disclosed.

a specific project in the spring of 1988. She contacted the City to inquire about the status of the projects the City had halted because they looked like promising developments. An engineer with an accent told her the projects were stopped because of encroachment and that the "surveys were wrong —were more than wrong, they were fraudulent" or "fabricated."[6] Because of this statement, de Pierris completely stopped referring clients to Masso.

Anwar Mirsa testified that he was strongly considering purchasing property on Westover Drive based on Aldine's recommendation. After hearing about problems between the City and Aldine, Mirsa called the city engineering department. An unidentified City employee told Mirsa the City was given "incorrect information" regarding the Westover lot and that the survey was "incorrect" and "not acceptable." In light of this information, Mirsa, who had previously intended to use Aldine's services for several projects, decided not to purchase property in the subdivision at all, and did not ask Aldine to work on his pending projects.

After a two-month trial, the jury held the City liable for defamation and placing respondents in a false light but failed to reach a verdict on the intentional interference claim against the City. The jury returned verdicts in favor of all three individual defendants.

## III. Discussion

The City contends the trial court committed reversible error by giving the jury the following instruction: "An essential element of damage by libel or slander is that the statement published was false. Consequently, if the statement was in fact true, there can be no defamation regardless of defendant's motivation. [¶] *The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish that the statement is true.*" (Italics added.) Citing *Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767 [89 L.Ed.2d 783, 106 S.Ct. 1558] *(Hepps)*, the City maintains that imposing on it the burden of proving its statements were true violated its First Amendment rights because those statements involved a matter of public concern.

In *Hepps*, the United States Supreme Court held that a private-figure plaintiff could not recover damages from a newspaper that published allegedly defamatory statements regarding a matter of public concern without showing that the statements at issue were false. *(Hepps, supra,* 475 U.S. at pp. 768-769 [89 L.Ed.2d at pp. 787-788].) The *Hepps* court found that the

---

[6]De Pierris testified that she thought the individual she spoke with was Tad Matsumoto, but that she was not sure. Matsumoto denied making any such statement to de Pierris.

First Amendment prohibits applying the common law presumption that defamatory speech is false when a plaintiff seeks damages against a media defendant for making statements on a matter of public concern. (*Id.* at p. 776 [89 L.Ed.2d at pp. 792-793].)

Respondents contend that *Hepps* does not apply here because (1) the City is not a media defendant and (2) the allegedly defamatory statements did not concern a matter of public interest. Alternatively, respondents contend that if the burden of proof instruction was erroneous, the error was harmless. For reasons that follow, we reject each of respondents' contentions and reverse the judgment.

A. *The First Amendment Prohibits Applying the Common Law Presumption of Falsity to Allegedly Defamatory Statements Which Relate to Matters of Public Interest*

Respondents emphasize that the *Hepps* court "specifically limited" its holding to media defendants and they ask this court to "maintain that limitation as consistent with California's 'special statutory protections to newspapers primarily engaged in disseminating information to its readership while the information is still "fresh." ' " (Quoting *Manguso* v. *Oceanside Unified School Dist.* (1984) 153 Cal.App.3d 574, 581 [200 Cal.Rptr. 535].)

Although the *Hepps* court did limit its holding to media defendants, it did not deny First Amendment protection to statements of public interest made by nonmedia defendants. Rather, the court simply declined to address an issue which was not before it. Further, the special statutory protections to newspapers referred to in *Manguso* v. *Oceanside Unified School Dist., supra,* are contained in Civil Code section 48a and have nothing whatsoever to do with the First Amendment issue we address today.

The parties have not identified nor have we found any California case which establishes whether or not *Hepps* protection is limited to media defendants.[7] However, our Supreme Court has stated, in dicta, that when "speech involves a matter of public concern, a private-figure plaintiff has the burden of proving the falsity of the defamation." (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 747 [257 Cal.Rptr. 708, 771 P.2d 406].) Further, courts in other jurisdictions that have faced this issue have extended

---

[7]In *Stolz* v. *KSFM 102 FM* (1994) 30 Cal.App.4th 195 [35 Cal.Rptr.2d 740], the court recognized that a finding that allegedly defamatory speech involves a matter of public concern independently imposes on plaintiff the burden to prove falsity of statements, regardless of whether plaintiff is a public figure. (*Id.* at p. 202.) Although the defendant in *Stolz* was a radio station, the court did not identify the defendant's media status as a prerequisite for imposing the burden of proving falsity on the plaintiff in that case.

*Hepps* protection to nonmedia defendants whose statements involve matters of public interest. (See *Pearce v. E.F. Hutton Group, Inc.* (D.D.C. 1987) 664 F.Supp. 1490, 1511 (*Pearce*); *In re IBP Confidential Bus. Documents Litigation* (8th Cir. 1986) 797 F.2d 632, 642, 647 (*IBP Confidential*).)

The *Pearce* court reasoned that, notwithstanding a "rather confusing reference to the media/nonmedia distinction" in *Hepps*, the crucial factor in that case was that the speech at issue was of public concern. (*Pearce, supra*, 664 F.Supp. at p. 1511.) Extending *Hepps* protection to nonmedia defendants whose statements involve matters of public interest is consistent with the reasoning in *Hepps* and other Supreme Court decisions addressing First Amendment concerns. (*Ibid.*) Further, as the Eighth Circuit stated in *IBP Confidential,* "[t]o recognize the existence of a first amendment right and yet distinguish the level of protection accorded that right based on the type of entity involved would be incompatible with the fundamental first amendment principle that '[t]he inherent worth of * * speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.' [Citations.]" (*IBP Confidential, supra*, 797 F.2d at p. 642.)

More than once in related contexts, this court has rejected the distinction between media and nonmedia defendants for purposes of determining whether speech is protected by the First Amendment. (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1607, fn. 3 [284 Cal.Rptr. 244]; *Hofmann Co. v. E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 407 [248 Cal.Rptr. 384], questioned on another ground in *Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528, 1543, fn. 4 [1 Cal.Rptr.2d 514].) In *Kahn v. Bower* we explained that applying the same constitutional standards to speech regardless of whether the defendant is a member of the media is "consistent with the general principle that members of the media have 'no special privilege to invade the rights and liberties of others.' [Citations.]" (*Kahn v. Bower, supra*, 232 Cal.App.3d at p. 1607, fn. 3.)

Courts in and out of California have echoed our sentiment, and rejected the distinction between media and nonmedia defendants when addressing related First Amendment issues. (See *Nadel v. Regents of University of California* (1994) 28 Cal.App.4th 1251, 1260 [34 Cal.Rptr.2d 188]; *Paradise Hills Associates v. Procel, supra*, 235 Cal.App.3d at pp. 1543-1544; *Miller v. Nestande* (1987) 192 Cal.App.3d 191, 198-200 [237 Cal.Rptr. 359, 62 A.L.R.4th 301]; *Don King Productions, Inc. v. Douglas* (S.D.N.Y. 1990) 742 F.Supp. 778, 782, fn. 4; *Moss v. Stockard* (D.C.App. 1990) 580 A.2d 1011, 1022-1023 & fn. 23.)

In *Nadel* v. *Regents of University of California* (*Nadel*), Division Five of this court held that the *New York Times* standard[8] for proving malice in a defamation action by a public figure or official against a media defendant also applies to defamation actions *against* government defendants. (*Nadel, supra,* 28 Cal.App.4th 1251.) Particularly pertinent to the issue we address is the *Nadel* court's recognition of the government's legitimate role in the interchange of ideas: "[I]f government has a legitimate role to play in the interchange of ideas—as we conclude it does—then government should have some measure of protection in performing that role, at least as to matters of public interest. Otherwise, if government is compelled to guarantee the truth of its factual assertions on matters of public interest, its speech would be substantially inhibited, and the citizenry would be less informed." (*Id.* at pp. 1266-1267.)

In sum, the distinction between media and nonmedia defendants which respondents ask us to recognize has been rejected by courts in other jurisdictions and is inconsistent with the First Amendment analyses set forth in several California cases. Indeed, respondents have not identified any authority to support their contention that the First Amendment would not be offended by imposing the burden of proving truth on a nonmedia defendant whose statements involve a matter of public interest. Therefore, we reject respondents' contention that *Hepps* does not apply in this case because the City is not a media defendant.

**B.** *The Allegedly Defamatory Statements in This Case Related to a Matter of Public Interest*

The First Amendment trumps the common law presumption of falsity in defamation cases involving private-figure plaintiffs when the allegedly defamatory statements pertain to a matter of public interest. (*Hepps, supra,* 475 U.S. at pp. 775-777 [89 L.Ed.2d at pp. 791-793].) Respondents contend the trial court correctly determined that the statements at issue in this case did not involve a matter of public interest. ▪ "The inquiry into the protected status of speech is one of law, not fact." (*Connick* v. *Myers* (1983) 461 U.S. 138, 148, fn. 7. [75 L.Ed.2d 708, 720, 103 S.Ct. 1684]) " '[W]hether . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record.' " (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749, 761 [86 L.Ed.2d 593, 603-604, 105 S.Ct. 2939], quoting *Connick* v. *Myers, supra,* 461 U.S. at pp. 147-148 [75 L.Ed.2d at pp. 720-721].)

---

[8]*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412] established that a public official or public figure must prove knowledge of falsity or reckless disregard of the truth in order to establish a news media defendant's liability for defamation.

The City contends the challenged statements pertained to a matter of public interest because they involved the City's decisionmaking process and because the survey dispute which provides the context for these statements had potentially enormous impact on surveyors and local residents. We are persuaded by the City's contention.

A primary goal of the First Amendment is "to protect the free discussion of governmental affairs." (*Mills* v. *Alabama* (1966) 384 U.S. 214, 218-219 [16 L.Ed.2d 484, 487-488, 86 S.Ct. 1434]; see also *Hofmann Co.* v. *E. I. Du Pont de Nemours & Co.*, *supra*, 202 Cal.App.3d at p. 406 (*Hofmann*); *Southern Cal. Rapid Transit Dist.* v. *Superior Court* (1994) 30 Cal.App.4th 713, 728 [36 Cal.Rptr.2d 665].) Indeed, we have previously noted that there is virtually universal agreement that the First Amendment protects the free discussion of governmental affairs including " 'discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated, and all such matters relating to political processes.*' [Citations]." (*Hofmann*, *supra*, 202 Cal.App.3d at p. 406, original italics.)

Arguing the allegedly defamatory statements were unrelated to governmental affairs, respondents characterize the challenged speech as nothing more than derogatory statements about their surveying skills made by individuals who just so happened to be employed by the City. When viewed in isolation, the specific phrases that have been extracted to formulate the basis of this action can be characterized as "derogatory statements" about Aldine and Masso. However, in considering whether they relate to matters of public interest, those statements must be viewed in context.

All five statements at issue here were responses by City employees to direct requests for information about a matter the City was involved in by virtue of its exercise of a governmental function.[9] Further, the speakers did not just so happen to be employed by the City. City officials were sought out and asked by members of the public to explain and/or to justify why the City exercised its discretionary power to stop work at the private construction

---

[9]The parties agree that statements allegedly made by the named individual defendants who were exonerated cannot support the judgment against the City. Thus we focus on the five statements that were allegedly made by other individuals employed by the City.

The City contends that only four of the statements in this case are attributable to unnamed defendants. It argues that the statement allegedly made to Marta de Pierris cannot be considered because that statement was made by defendant Matsumoto. However, de Pierris admitted she was not sure who she spoke to and Matsumoto denied making any such statement. Indeed, the City's counsel argued during closing argument that the statement was not made by Matsumoto. And respondents' counsel did not attribute this statement to Matsumoto during its closing argument.

sites. These inquiries and the City's responses were "discussion[s] of governmental affairs"; the freedom of such discussion is protected by the First Amendment. (See *Mills* v. *Alabama, supra,* 384 U.S. at pp. 218-219 [16 L.Ed.2d at pp. 487-488].) Indeed, all of the statements at issue in this case were not only made by government officials, but related directly to a matter with which the speakers had become involved *qua* representatives of local government. This crucial fact distinguishes the only two cases respondents cite in which it was found that the speech at issue did not relate to matters of public interest. (See *Snead* v. *Redland Aggregates Ltd.* (5th Cir. 1993) 998 F.2d 1325, 1330; *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. 749.)

Respondents correctly observe that not all speech relating to governmental affairs necessarily deserves First Amendment protection. We have previously recognized the possibility that some speech might concern aspects of government that "do not genuinely implicate any broad public interest nor materially enhance the self-governing ability of the public." (*Hofmann, supra,* 202 Cal.App.3d at p. 407.) Attempting to fit this case into that realm of unprotected speech, respondents contend the challenged statements relate to a private dispute between themselves and the City which did not implicate any genuine public interest. We disagree for at least two reasons.

First, the fact that the City (via certain of its employees) believed respondents' surveys were sufficiently defective to warrant reporting them to the State of California's licensing board, the Board of Engineers, bespeaks the public nature of the survey dispute. Members of the public "have an interest in matters which affect their roles as consumers." (*Paradise Hills Associates* v. *Procel, supra,* 235 Cal.App.3d at p. 1544.) And, as Division Five of this court recognized in *Nadel, supra,* it is a legitimate and important function of government not only to gather information about commercial and trade practices which are detrimental to consumers, but also to inform the public (including other pertinent governmental agencies) about those practices.[10] (*Nadel, supra,* 28 Cal.App.4th at p. 1263.) If government is denied First Amendment protection in situations such as the present one, the performance of its "informing function" could be inhibited in order to avoid defamation liability "to the ultimate detriment of consumers." (*Ibid.*)

Second, when viewed in context, the negative statements about respondents' surveys unquestionably relate to a broader public issue—whether

[10]Indeed, the *Nadel* opinion points out the role played by California's Department of Consumer Affairs in acquiring and disseminating information about "detrimental trade practices by specific individuals." (*Nadel, supra,* 28 Cal.App.4th at p. 1263.) This department is the "parent" to the Board of Engineers, the body to whom certain of the City employees involved in this dispute threatened to "report" respondents. (Bus. & Prof. Code, § 101, subd. (i).)

boundary lines in the Forestland Manor subdivision should be drawn in accordance with the 1927 map or the 1954 map. The record belies respondents' contention that the public was not interested in this issue. Paul Tamm, president of the local homeowners association, sought information about it, shared that information with other members of the association and discussed the dispute in association newsletters. Homeowners in the area could be affected by the resolution of this dispute and had a legitimate interest in obtaining information about it from their city government. If the 1927 map was indeed valid, as respondents had contended, boundary lines that had been drawn in the subdivision without reference to that map would be called into question. Further, interest in the dispute was not limited to residents of the subdivision. Anwar Mirsa, a citizen who considered purchasing property in the subdivision, and Marta de Pierris, a local realtor, also expressed interest in the dispute.

Attempting to analogize this case to *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra*, 472 U.S. 749 (*Dun & Bradstreet*), respondents emphasize that the challenged statements in this case were made to only five individuals and were not reported by the media or otherwise widely disseminated. In *Dun & Bradstreet*, the Supreme Court found that a false credit report generated by the petitioner did not relate to a matter of public interest.[11] The *Dun & Bradstreet* court emphasized that the credit report was "speech solely in the individual interest of the speaker and its specific business audience," that it was available only to that limited audience and that it could not be disseminated any further. (*Id.* at p. 762 [86 L.Ed.2d at p. 604].)

In contrast to *Dun & Bradstreet*, the statements at issue in this case were not solely of interest to the speaker and a specific business audience. Rather, the speakers' interest was that of a local governing authority and the speakers' audience, the five individuals who testified about the defamatory statements, were not members of a specific business audience. They were members of the public. This public audience included the president of the local homeowners' association, a realtor interested in marketing the property to the public, a potential purchaser of property in the subdivision, a local building contractor, and a civil engineer. The varied backgrounds of these individuals underscores the extent of public interest in the surveying dispute. If respondents' surveys were accurate and the City's 1954 map was not valid, many kinds of people would be affected—current and potential purchasers of property in the area, realtors who marketed the properties and engineers and contractors who helped develop the subdivision.

---

[11]*Dun & Bradstreet* established that ". . . permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." (*Dun & Bradstreet, supra*, 472 U.S. at p. 763 [86 L.Ed.2d at p. 605].)

The speech at issue in *Dun & Bradstreet* related solely to the plaintiff's credit history and was unrelated to any broader public issue. Further the information contained in the report could not be disseminated beyond a limited few. Thus, the report did not implicate the First Amendment goals of encouraging the " 'free flow of . . . information' " and ensuring that " 'debate on public issues . . . be uninhibited, robust, and wide-open.' " (*Dun & Bradstreet, supra*, 472 U.S. at p. 762 [86 L.Ed.2d at p. 604].) In contrast, in the present case, the private aspects of the dispute between respondents and the City are overshadowed by the public interest in the outcome of the survey dispute. The allegedly defamatory statements provided information the free flow of which is encouraged by the First Amendment. Further, although the dispute was between the City and a private party, the debate about the validity of respondents' surveys was a matter of public concern and should therefore have been " 'uninhibited, robust, and wide-open.' " (*Ibid.*)

In sum, we conclude the allegedly defamatory statements at issue in this case pertained to a matter of public interest. Therefore, the trial court erred by imposing on the City the burden of proving the allegedly defamatory statements were true.

## C. *The Erroneous Burden of Proof Instruction Resulted in a Miscarriage of Justice Requiring Reversal of the Judgment*

 The parties disagree as to the applicable standard for determining whether giving the improper burden of proof instruction constituted prejudicial error requiring reversal of the judgment against the City. The City argues that the "harmless beyond a reasonable doubt" standard applies because the error was of federal constitutional dimension. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Respondents contend that instructional error in a civil action requires reversal of the judgment only if the error resulted in a miscarriage of justice. (See *Lundquist* v. *Reusser* (1994) 7 Cal.4th 1193, 1213 [31 Cal.Rptr.2d 776, 875 P.2d 1279]; *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298]; Cal. Const., art. VI, § 13.)

We find it unnecessary to resolve the parties' disagreement because we conclude that, even under the more relaxed prejudice standard, the instructional error in this case was prejudicial. Under this more relaxed standard, prejudice is established if "it appears probable that the improper instruction misled the jury and affected the verdict." (*Lundquist* v. *Reusser, supra*, 7 Cal.4th at p. 1213.) Reversal is required " ' "when the court, 'after

an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' [Citation.]" (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163].)

Several factors are relevant to this determination including " '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' [Citations.]" (*Pool* v. *City of Oakland, supra,* 42 Cal.3d at pp. 1069-1070; accord *Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 580-581.)

 The strongest factor evincing prejudice in this case is the degree of conflicting evidence as to whether the allegedly defamatory statements were false. For example, whether respondents' surveys were valid was a crucial question vigorously disputed by the parties. The erroneous instruction permitted the jury to avoid answering this question; it could hold the City liable simply by finding the City had failed to prove the surveys were invalid. Had the tables been turned, and the burden of proving falsity been placed on respondents, we think it is reasonably probable the jury would have found that respondents failed to carry that burden.

The parties briefs on appeal vividly illustrate that there was voluminous conflicting evidence no particular item of which conclusively established whether the allegedly defamatory statements were true or false. When, as here, substantial evidence in the record would support either finding, an erroneous burden of proof instruction is prejudicial. (See *Thomas* v. *Lusk* (1994) 27 Cal.App.4th 1709, 1720 [34 Cal.Rptr.2d 265]; *Fagerquist* v. *Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 726 [236 Cal.Rptr. 633].)

Other factors also support our finding of prejudice. Respondents' trial counsel repeatedly emphasized the erroneous burden of proof instruction during closing argument. Indeed, respondents' counsel emphasized that the City "can not prove in this case that the statements they made were true, that the surveys were fraudulent, that the monuments were not placed where they said they were." Further, several facts suggest this was a very close case. The jury deliberated for nearly seven full days, the individual defendants were found not liable, and the verdict against the City was nine to three.

Finally, we reject respondents' contention that the instructional error was cured by other instructions. No other instruction required that respondents actually prove the allegedly defamatory statements were false. Thus, respondents' reliance on *Lundquist* v. *Reusser, supra,* 7 Cal.4th 1193, is misplaced. In that case an erroneous instruction placing the burden of proving common law malice on a defendant in a defamation action was not prejudicial because plaintiff had carried the heavier burden of proving defendants' conduct was so egregious that she was entitled to punitive damages. By finding plaintiff satisfied this "heightened" requirement, the jury necessarily concluded that defendants acted with common law malice. (*Id.* at pp. 1213-1214.)

There is no instruction in the present case which served the function of the punitive damages instruction that was given in *Lundquist.* The jury in this case was never asked to determine whether respondents proved the statements at issue were actually false. The only instruction respondents identify which imposed any burden on them at all is the instruction which properly required plaintiffs to prove the City acted with common law malice. However, contrary to respondents' contention, the malice instruction did not require the jury to expressly or impliedly find that the allegedly defamatory statements were false. Rather, malice could be established by evidence of hatred or ill-will.[12]

The burden of proof instruction erroneously required the City to prove its statements were true to avoid liability. No other instruction required the jury to disregard this improper presumption of falsity and to actually find that the statements at issue were false. The instructional error was, therefore, not cured and the erroneous burden of proof instruction prejudiced the City.

## IV. DISPOSITION

The judgment is reversed. Each party shall bear their own costs on appeal.

Kline, P. J., and Smith, J., concurred.

Respondents' petition for review by the Supreme Court was denied November 13, 1996.

---

[12]The jury was instructed: "A defendant publishes a defamatory statement about plaintiff, with malice, when the statement is published without a good faith belief in the truth of the statement, or without reasonable grounds for believing the statement true, or motivated by hatred or ill-will toward, the plaintiff. [¶] Plaintiff has the burden of proving by a preponderance of the evidence all of the facts necessary to establish malice."