Filed 7/24/24  J&T Bellflower v. Russman CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| J&T BELLFLOWER,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>F. MARINA RUSSMAN,<br><br>    Defendant and Appellant. | B329531<br><br>Los Angeles County<br>Super. Ct. No.<br>21NWCV00065 |

    APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge. Affirmed.
    Joseph J.M. Lange for Defendant and Appellant.
    Kalab A. Honey; Sainick Law, Frederick B. Sainick and Nolan C. Sainick for Plaintiff and Respondent.

# INTRODUCTION

By executing a written lease, F. Marina Russman, M.D., agreed to rent a medical suite from GC Property Associates, LLC (GC), for three years, beginning April 1, 2018. Dr. Russman stopped paying rent in April 2020. After the lease expired, J&T Bellflower, GC's successor-in-interest on the lease, sued Dr. Russman to recover unpaid rent and fees.

Following a trial, a jury rendered a unanimous verdict in favor of J&T Bellflower, finding: (1) J&T Bellflower performed its obligations under the lease, including those required under the covenant of quiet enjoyment; (2) Dr. Russman breached the lease by failing to pay rent and other fees due under its terms; (3) J&T Bellflower was harmed by Dr. Russman's failure to make the required payments; and (4) J&T Bellflower sustained $38,599.20 in damages. Subsequently, the trial court entered judgment for J&T Bellflower.

On appeal, Dr. Russman asserts the judgment must be reversed for three reasons. First, she contends the trial court erred by instructing the jury that she bore the burden of proving J&T Bellflower breached the covenant of quiet enjoyment. Instead, she argues, the court should have instructed the jury that J&T Bellflower was required to prove it satisfied its obligations under the covenant to prevail on its breach of contract claim. Second, she argues the verdict is unsupported by substantial evidence. Finally, Dr. Russman contends two assertedly erroneous evidentiary rulings against her require reversal. For the reasons stated below, we reject her contentions and affirm.

## BACKGROUND

Dr. Russman treats workers' compensation patients, a handful of private patients, and Medicare patients. She signed a lease agreeing to rent the medical suite from GC for three years, beginning on April 1, 2018. The suite is one of eight in a commercial building in Bellflower. J&T Bellflower acquired title to the building in March 2020. GC assigned its rights under Dr. Russman's lease to J&T Bellflower.

California Commercial, a property management company primarily serving healthcare facilities, handled the building's day-to-day operations on behalf of GC, and later J&T Bellflower, through a property manager named Jacqueline Paiz.

Shortly after moving in, Tanya Imonti, Dr. Russman's general manager of operations, observed several problems with the suite and verbally brought them to Paiz's attention. Paiz responded by asking Imonti to put her concerns in writing. Imonti then drafted a document titled "Repair Requests[ ]" (Repair Request) and gave a copy to Paiz. (Underlining and bolded text omitted.) Dated April 4, 2018, the Repair Request set forth a "list of items . . . within the office that require[d] repair/replacement[.]" This list identified the following issues, among others: (1) a leaking and discolored sink, along with the smell of moisture and mold, in one of the bathrooms; (2) stains and mildew in the lower cabinets in each room; and (3) a "cockroach issue" based on the staff's observation of "at least 3-4 large roaches."

Subsequently, Paiz and Imonti walked through the Repair Request together. After investigating and/or addressing the issues in the Repair Request, Paiz returned the document to Imonti with handwritten notes describing the actions she took for

each item. We set forth Paiz's testimony regarding her responses to the relevant items on the Repair Request in section II.B of the Discussion below.

Dr. Russman occupied the medical suite from April 2018 through March 2020. During that time, Imonti spoke to Paiz and her assistants about the presence of cockroaches in the suite on several occasions. At no point, however, did Dr. Russman or her staff send California Commercial additional written notices requesting further action to address unresolved issues relating to cockroaches, mold, or a leaking sink.

As noted above, Dr. Russman stopped paying rent in April 2020. According to Paiz, Dr. Russman then "went radio silent" and did not respond to her e-mails, text messages, or phone calls. Consequently, in September 2020, California Commercial served Dr. Russman with a three-day notice to quit and sent an e-mail to Dr. Russman's counsel demanding payment in full of the balance due. Dr. Russman's counsel responded by stating "the suite has not been habitable for a medical office due to infestation . . . and black mold." Because Dr. Russman continued to store items in the suite, did not return the suite's keys, and did not provide notice she was vacating and/or surrendering the suite, California Commercial did not retake possession of the suite until after the lease terminated in March 2021.

J&T Bellflower initiated the underlying action in February 2021. Its operative first amended complaint asserts a single breach of contract claim against Dr. Russman. The complaint alleges Dr. Russman failed to pay rent for the medical suite beginning in April 1, 2020 and, as GC's successor-in-interest, J&T Bellflower is entitled to payment of rent and late fees due, along with interest, under the lease's terms.

As noted above, a jury unanimously reached a verdict in favor of J&T Bellflower. Via a special verdict, it found: (1) J&T Bellflower did all or substantially all of the significant things that the lease required it to do regarding the covenant of quiet enjoyment; (2) Dr. Russman breached the lease by failing to pay rent and other fees due under its terms; (3) J&T Bellflower was harmed by Dr. Russman's breach; and (4) J&T Bellflower sustained $38,599.20 in damages. Thereafter, the trial court entered judgment for J&T Bellflower. Dr. Russman appealed.

## DISCUSSION[1]

## I. Instructional Error

### A. Governing Principles

"Article VI, section 13 of the California Constitution provides that '[n]o judgment shall be set aside, or a new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'

"The California Supreme Court has interpreted the 'miscarriage of justice' phrase as prohibiting a reversal unless there is 'a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.' (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [(*Soule*)].) Thus, when challenging the jury instructions given in a civil case, the appellant must show it was 'reasonably probable

---

1     J&T Bellflower's request to correct its respondent's brief is granted, and the technical revisions delineated in its notice of errata are deemed to be incorporated into the brief on file.

5

the jury would have returned a more favorable verdict[ ]' [absent the alleged instructional error]. (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1073.)

"The California Supreme Court also has provided guidance for applying the constitutional requirement for 'an examination of the entire cause' (Cal. Const., art. VI, § 13) when assessing prejudice from instructional error. Insofar as relevant, courts should consider (1) the degree of conflict in the evidence on the critical issues; (2) whether the winning side's argument to the jury may have contributed to the instruction's misleading effect; (3) whether the jury requested rereading of the erroneous instruction or related evidence; (4) the closeness of the jury's verdict; and (5) the effect of other instructions in remedying the error. (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at pp. 570-571.) Stated more succinctly, the assessment 'requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled.' (*Id.* at p. 574.)

"An appellate court's responsibility to conduct 'an examination of the entire cause' (Cal. Const., art. VI, § 13) is triggered 'when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of a given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice.' (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) These principles are derived from the axiom that prejudice is not presumed and the burden is on the appealing party to demonstrate that prejudice has occurred. (*Id.* at p. 105.)" (*Adams*

*v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 613-614, fn. omitted (*Adams*).)

### B.    Analysis

A key issue at trial was whether J&T Bellflower breached the lease's covenant of quiet enjoyment and, consequently, was prohibited from recovering the past-due rent and fees. Regarding the burden of proof on this issue, the trial court instructed the jury as follows, over Dr. Russman's objection: "The defendant must prove that the plaintiff breached the duty to provide quiet enjoyment and failed to remediate problems complained about."

Dr. Russman contends this constituted reversible error. She asserts: (1) the instruction incorrectly stated the law because, to prevail on its breach of contract claim, J&T Bellflower bore the burden of proving it performed its obligations under the lease, including those required under the covenant of quiet enjoyment; and (2) the instruction was prejudicial because "when a record contains substantial evidence to support a finding for either a plaintiff or defendant on an issue, . . . there is a reasonable possibility the appealing party would have achieved a more favorable result absent the error."

Even assuming, *arguendo*, the instruction erroneously reversed the burden of proof on the covenant of quiet possession issue, however, Dr. Russman has not carried her burden of demonstrating prejudice. As discussed above, the assessment of prejudice from instructional error in a civil case "'requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled.'" (*Adams, supra,* 224 Cal.App.4th at p. 614.) And, Dr. Russman, as the appellant, "b[ore] the duty of spelling out in [her] brief exactly how" these

7

factors, based on "'the particulars of [this] . . . case, . . . caused a miscarriage of justice.'" (*Ibid*; see also *Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1045 ["'In addition to showing an instructional error occurred, an appellant must establish the error was prejudicial'"].)

Dr. Russman does not reference, let alone apply, the multi-factor analytical framework governing whether an erroneous jury instruction is prejudicial. Instead, she argues that whenever the record contains substantial evidence to support a finding in an appellant's favor, an erroneous instruction shifting the burden of proof is prejudicial. In so doing, Dr. Russman implies that whenever an instruction reverses the burden of proof on any issue, the factor relating to the state of the evidence is dispositive and, therefore, the other *Soule* factors are irrelevant.

We reject Dr. Russman's argument as unsupported by authority. Specifically, based on the cases cited in support of her argument, we are not persuaded that a finding of prejudice must lie from an instruction reversing the burden of proof whenever the record contains substantial evidence to support a finding in the appellant's favor. In all but one of those cases, the appellate courts applied each of the *Soule* factors and, based on the specific facts presented, concluded the trial court's erroneous instruction reversing the burden of proof was prejudicial. (See *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 379-381; *Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 393-398; *Khoiny v. Dignity Health* (2022) 76 Cal.App.5th 390, 412-417.) And the fourth and final case, *Thomas v. Lusk* (1994) 27 Cal.App.4th 1709 (*Thomas*), was decided before our Supreme Court issued its decision in *Soule*, *supra*, 8 Cal.4th 548, where it held "there is no rule of automatic reversal or 'inherent' prejudice

8

applicable to any category of civil instructional error, whether of commission or omission[,]" and summarized the multi-factor framework governing whether instructional error is prejudicial in civil cases. (*Soule,* at pp. 580-581; see also *Adams*, *supra*, 224 Cal.App.4th at p. 614 [observing that, in *Soule*, the Supreme Court identified several factors courts should consider when assessing prejudice from instructional error].) Thus, to the extent the *Thomas* court's brief analysis of prejudice suggests an erroneous instruction shifting the burden of proof on an issue is prejudicial so long as the "evidence . . . [on that issue is] inconclusive" and could support a finding in the appellant's favor, we decline to follow it. (*Thomas*, at p. 1720.)

In sum, for the reasons stated above, we reject Dr. Russman's instructional error argument because she has not carried her "burden . . . [of] demonstrat[ing] that prejudice has occurred." (*Adams*, *supra,* 224 Cal.App.4th at p. 614.)

## II.     Sufficiency of Evidence to Support the Verdict

### A.     Governing Principles
#### 1.     The Covenant of Quiet Enjoyment

"In the absence of language to the contrary, every lease contains an implied covenant of quiet enjoyment, whereby the landlord impliedly covenants that the tenant shall have quiet enjoyment and possession of the premises. [Citations.] The covenant of quiet enjoyment 'insulates the tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy. [Citations.]'" (*Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 588, italics and fn. omitted (*Andrews*).) "Minor inconveniences and annoyances are not actionable breaches of

the covenant of quiet enjoyment. To be actionable, the landlord's act or omission must substantially interfere with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy." (*Id.* at p. 589.)

"The covenant of quiet enjoyment cannot be waived or modified when the premises are used for residential purposes. In the commercial lease setting, however, it may be modified or waived by the tenant. If the premises are used for nonresidential purposes, the lease can contain an express covenant or other language that expresses the landlord's intent to assure the tenant quiet enjoyment of the premises, or it may give the landlord the right to do, or not do, some act . . . that might otherwise constitute . . . a breach of the covenant." (Miller & Starr, Cal. Real Estate (4th ed. 2023) § 34:63, fns. omitted.)

## 2. Substantial Evidence Review

"Where an appellant argues that a particular verdict is not supported by sufficient evidence, our review 'begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' [Citation.] 'Substantial' refers to the quality, not the quantity, of the evidence. [Citation.] 'Substantial evidence is evidence that is "of ponderable legal significance," "reasonable in nature, credible and of solid value," and "'substantial' proof of the essentials which the law requires in a particular case."' [Citation.] The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable. [Citations.]

In exercising substantial evidence review, an appellate court does not evaluate the credibility of the witnesses but defers to the trier of fact. [Citations.] Similarly, the court does not

reweigh the evidence, but will uphold a judgment that is supported by substantial evidence even if substantial evidence to the contrary also exists." (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 381-382, italics omitted (*DeNike*).) In addition, under substantial evidence review, "all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) Moreover, "[w]hen two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the [trier of fact]." (*Ibid.*)

## B. Analysis

Dr. Russman argues reversal is required because the record lacks substantial evidence to support the jury's finding that J&T Bellflower satisfied its obligations under the covenant of quiet enjoyment. Specifically, she argues J&T Bellflower failed to address the suite's cockroach infestation, the presence of mold, mildew, and leaky plumbing in the suite, and the building's ongoing security issues. In so doing, Dr. Russman emphasizes the evidence beneficial to her while ignoring or minimizing the evidence against her, and effectively asks us to reweigh the evidence and reevaluate witness credibility in her favor. As a reviewing court, however, we are bound by the limitations of substantial evidence review and cannot view the record through her proffered lens. (See *DeNike, supra,* 76 Cal.App.5th at pp. 381-382.) Instead, we must apply the principles set forth above and, as discussed below, conclude the record contains substantial evidence to support a finding that J&T Bellflower, through California Commercial, satisfied its obligations under the covenant of quiet enjoyment.

11

We begin our analysis with the relevant lease provisions. Paragraph 38 sets forth the lease's covenant of quiet possession and enjoyment as follows: "Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof."

Paragraph 13.6(a) defines when J&T Bellflower may be considered in breach of the lease. It states, in relevant part: "Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor . . . of written notice specifying wherein such obligation of Lessor has not been performed . . . ." Paragraph 23.1, in turn, delineates how notice must be given under the lease, providing, in relevant part: "All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23."

Having set forth the pertinent lease provisions, we turn our attention to the evidence relating to J&T Bellflower's performance of its duties under the covenant of quiet enjoyment through California Commercial. As noted above, the evidence shows that, shortly after Dr. Russman and her staff moved into the suite in April 2018, Imonti provided Paiz with the Repair Request, which asked Paiz to address the following issues, among

others: (1) the smell of moisture and mold, as well as a discolored and leaking sink, in one of the bathrooms; (2) stains and mildew in all of the lower cabinets; and (3) a "cockroach issue."

Paiz testified that, either the same day or the day after she received the Repair Request, she went to the medical suite to investigate Imonti's reports of mold and mildew. Paiz testified she "take[s] mold very seriously" and that, "if a tenant or anybody reports [mold], [she] ha[s] to address it . . . immediately." Upon inspection, Paiz did not find any signs of mold. Nor did she detect any odors. Paiz also spoke to Imonti and informed her that the cabinets' stains were from items previously stored inside. Paiz testified she was "100% certain that [the stains] w[ere] not mold" and that, had she discovered mold, she would have "call[ed] a remediation company out" to "properly address [the] mold" by "quarantin[ing] the area and treat[ing] it." According to Paiz, there were no incidents of mold in any of the other suites.

Paiz's testimony relating to the reports of mold and mildew is consistent with her hand-written notes on the Repair Request. In response to the report of mold and odors coming from one of the bathrooms, Paiz wrote: "[I]nspection completed, no mold[.]" Similarly, with respect to the report of stains and mildew in the lower cabinets, Paiz wrote: "[I]nspection completed, not mildew, stains are from stuff being stored[.]"

Paiz testified that, upon receiving the report of a leaking sink in the suite, she followed California Commercial's protocol for handling maintenance requests by opening a work order and dispatching an engineer, who fixed the sink. Her testimony on this point is supported by a work order in the record stating that, on April 9, 2018, five days after Paiz received the Repair Request, a plumber spent 20 minutes to fix a leaking sink in the suite,

13

during which he "tightened sink drain tailpiece to strainer." Paiz's testimony is also consistent with her notes on the Repair Request reflecting that, in response to the report of "sink leak and discoloration," Paiz wrote "hardware replaced."

With respect to pest remediation, Paiz testified California Commercial has a pest control contract for all of the buildings it manages. For the building housing Dr. Russman's suite, the contract requires Ecolab Pest Elimination (Ecolab) to provide services on a monthly and as-needed basis for insect and rodent control. Through the monthly services, Ecolab treats the building's exterior and hallways for cockroaches and ants. Individual suites are only treated as-needed, upon tenant request. On this point, Paiz testified that if a tenant reported "they saw a critter," she would call Ecolab and schedule a treatment for the area in question to address the pest observed.

Paiz testified that, after receiving the Repair Request's report relating to cockroaches, she saw a dead cockroach in the medical suite. In response, Paiz "addressed [the issue] immediately" by "contact[ing] Ecolab to treat the space." According to Paiz, Ecolab then treated Dr. Russman's suite for cockroaches. Further, Paiz testified that, in the time Dr. Russman occupied the suite, there was never an instance when Dr. Russman's staff complained to her about cockroaches, but she did not thereafter call Ecolab out to treat their suite. No other suites reported having issues with cockroaches. And, again, Paiz's testimony is consistent with the notes she made on the Repair Request. Next to the item requesting "[e]xtermination of cockroach issue[,]" Paiz wrote: "DONE – Ecolab[.]"

Paiz testified that, after receiving the Repair Request, she did not receive any other written notices informing her of further

14

issues with the suite requiring attention. Paiz also did not receive any additional complaints relating to mold or a leaking sink. While she had multiple conversations with Imonti about cockroaches, Imonti did not report an infestation. Further, Paiz was never notified that Dr. Russman was "upset with something that [J&T Bellflower] was or was not doing[,]" or that she considered J&T Bellflower to be in breach of the lease.

With respect to the building's "security issues," Imonti testified homeless people slept in the entryway, and that the suite was burglarized in December 2019. Similarly, Dr. Russman testified homeless people "gather[ed] in the stairwells" and that there was "a burglary . . . where things were tossed in [her] office." But the lease absolved J&T Bellflower of any duty to provide security services.[2]

In sum, through paragraphs 13.6(a) and 23.1 of the lease, the parties agreed that J&T Bellflower cannot be deemed in breach of the covenant of quiet enjoyment unless (1) Dr. Russman notified J&T Bellflower in writing that it has failed to perform its obligations thereunder, and (2) J&T Bellflower fails to perform those duties within 30 days after receiving the notice. In addition, per paragraph 40, the parties effectively agreed to modify the covenant of quiet enjoyment by relieving J&T Bellflower of all

---

2      Paragraph 40 relieves J&T Bellflower of the duty to protect the suite and its occupants from third-parties. On this point paragraph 40 states, in pertinent part: "Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties."

responsibility to provide security services or protect the suite and/or its occupants from the acts of third-parties.

Paiz received only one written notice from Dr. Russman's office identifying issues in the suite requiring attention (i.e., the Repair Request). Soon thereafter, Paiz: (1) personally investigated the suite and observed no mold, mildew, or moisture-related odors; (2) opened a work order for the suite's leaking sink and dispatched a plumber, who fixed the problem a few days later; and (3) contacted Ecolab, which treated the suite for cockroaches. Paiz did not receive further written notice of any ongoing or additional problems relating to those previously reported. Nor did she receive any notice that Dr. Russman was dissatisfied with California Commercial's efforts to address those issues, or that Dr. Russman considered J&T Bellflower to be in breach of the lease. And although the suite was burglarized, and there was an issue with homeless people in the building, Dr. Russman—not J&T Bellflower—assumed all responsibility for the protection of the suite and its occupants.

Based on this evidence, we conclude a reasonable trier of fact could find J&T Bellflower did not breach the lease's covenant of quiet enjoyment by committing an "'act or omission'" that substantially "'interfere[d] with [Dr. Russman's] right to use and enjoy [the medical suite] for the purposes contemplated by the [lease].'" (*Andrews, supra,* 125 Cal.App.4th at p. 588.) Accordingly, we conclude the record contains substantial evidence to support the jury's finding in J&T Bellflower's favor on the issue.

16

## III. Evidentiary Rulings

### A. Governing Principles

"We apply the abuse of discretion standard when reviewing the trial court's rulings on evidentiary objections." (*Twenty-Nine Palms Enterprises, Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447.) An "evidentiary ruling requires reversal only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Id.* at p. 1449.)

### B. Analysis

Dr. Russman contends reversal is required because the trial court erroneously: (1) permitted Paiz to testify about an "unmarked, purported Ecolab record that supposedly demonstrated when some form of extermination treatment occurred in the [s]uite"; and (2) "precluded [Dr. Russman] from proffering three photos of the burglary." We address each argument in turn below.

#### 1. Admission of Paiz's Testimony Describing the Contents of an Ecolab Document

During Paiz's redirect examination, counsel for J&T Bellflower sought to introduce a document, which the trial court described as "some kind of a receipt." Dr. Russman's counsel objected to the document on the ground that it had not been produced in discovery. The trial court overruled the objection.

Paiz testified that the receipt was a customer service report from Ecolab, dated April 19, 2018. Dr. Russman's counsel objected, arguing Paiz's testimony was hearsay and based on an unauthenticated document. The trial court overruled the objection. Paiz then described the report, testifying that it stated

suite 103 (i.e., Dr. Russman's suite) was treated for cockroaches on the date above.

In arguing reversible error, Dr. Russman asserts Paiz's testimony describing the Ecolab customer service report was hearsay, and that the business records exception to the hearsay rule does not apply. Her opening brief, however, does not address or otherwise describe how she was prejudiced by the trial court's evidentiary ruling. Accordingly, Dr. Russman has forfeited any argument pertaining to prejudice (*Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438, 455 ["Ordinarily, an argument not raised in the opening brief is forfeited on appeal"]) and, for this reason alone, has failed to demonstrate reversal is required even assuming, *arguendo*, the trial court erred by overruling her objections to Paiz's testimony. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 655-656 (*IIG*).)

In any event, we acknowledge that, for the first time in her reply brief, Dr. Russman argues: "Not only was the trial court's admission of [Paiz's testimony relating to the Ecolab customer service report] erroneous, but it was highly prejudicial to [her] since there was no other evidence proffered that Ecolab—or anyone else—performed extermination services in the [s]uite and [she] proffered substantial evidence that no services ever occurred." We reject this contention because—contrary to Dr. Russman's argument—the record is not devoid of other evidence showing the suite was treated for cockroaches during the period of her occupancy. As discussed above, Paiz testified that, soon after she received the Repair Request from Imonti, she asked Ecolab to treat Dr. Russman's suite, at which point Ecolab did, in fact, treat the suite for cockroaches. Accordingly, Dr. Russman has not satisfied her burden of showing that the testimony in

18

question "was so damaging that[,] in its absence, a different result was probable." (*IIG*, *supra*, 22 Cal.App.5th at pp. 655-656.)

## 2. Exclusion of Photographs Depicting the Suite After the Burglary

At trial, Dr. Russman's counsel sought to present pictures depicting how the suite had been "trashed" as a result of the burglary. The trial court excluded the evidence under Evidence Code section 352. In so doing, the court reasoned that only the burglary's occurrence—not its severity—was relevant to Dr. Russman's theory that J&T Bellflower breached the covenant of quiet enjoyment. Therefore, the trial court explained, because J&T Bellflower did not dispute that the burglary took place, the photographs depicting "the [suite] was trashed" were "very prejudicial" and only had "slight probative value."

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'"Prejudice" in the context of Evidence Code section 352 refers to the possibility of misuse of the evidence—use of the evidence by the trier of fact for a purpose for which the evidence is not properly admissible.'" (*People v. Jiminez* (2019) 35 Cal.App.5th 373, 390.)

We discern no abuse of discretion in the trial court's Evidence Code section 352 analysis. As the court observed, Dr. Russman's theory at trial was that J&T Bellflower breached the covenant of quiet enjoyment by failing to provide security services as promised, which resulted in the suite being broken into and burglarized. J&T Bellflower did not dispute the

19

burglary's occurrence. Instead, it presented evidence showing the lease did not require J&T Bellflower to provide security services, and that Dr. Russman expressly assumed responsibility for the protection of the suite and its occupants. Under these circumstances, the trial court did not exceed the bounds of its discretion by determining photographs depicting the suite being "trashed" as a result of the burglary had little probative value, which was outweighed by a high risk of undue prejudice.

## DISPOSITION

We will not disturb the jury's verdict. The judgment is affirmed. Respondent shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, P. J.

We concur:

COLLINS, J.

ZUKIN, J.