[No. G046397. Fourth Dist., Div. Three. Mar. 11, 2013.]

CITY OF COSTA MESA, Plaintiff, Cross-defendant and Appellant, v.
D'ALESSIO INVESTMENTS, LLC, et al., Defendants, Cross-complainants
and Appellants;
MELYNDA SHANK et al., Cross-defendants and Appellants.

362

364

## COUNSEL

Jones & Mayer, James R. Touchstone, Krista Macnevin Jee and Chris F. Neumeyer for Plaintiff, Cross-defendant and Appellant and for Cross-defendants and Appellants.

Darryl J. Paul for Defendants, Cross-complainants and Appellants.

## OPINION

**IKOLA, J.**—Dennis D'Alessio and D'Alessio Investments, LLC (collectively, D'Alessio), own commercial real property at 440 Fair Drive in Costa Mesa, California (the Property). In April 2011, the City of Costa Mesa (the City) sued D'Alessio and various tenants at the Property to abate a public nuisance—namely, alleged acts of prostitution at several massage establishments and the operation of medical marijuana dispensaries in violation of the City's zoning code. The trial court granted preliminary injunctions in favor of the City in August 2011, enjoining the prohibited practices during the pendency of the action. In September 2011, D'Alessio filed a cross-complaint alleging the City and certain individual employees (George Nichols, Willa Bouwens-Killeen, Mel E. Lee, Melynda Shank, and Minoo Ashabi) committed slander, trade libel, and intentional interference with prospective economic advantage by making certain statements to D'Alessio's potential tenants and construction contractors.[1] The City and the employees filed an anti-SLAPP (strategic lawsuit against public participation) motion, which the court granted in part and denied in part. (Code Civ. Proc., § 425.16; hereafter

---

[1] The cross-complaint mistakenly referred to Willa Bouwens-Killeen as "Bouwens-Lilleen." We shall utilize her correct name in this opinion.

section 425.16.) Because we conclude the court should have granted additional (but not all) aspects of the anti-SLAPP motion, we affirm in part and reverse in part.

## FACTS

*Complaint*

In April 2011, the City and the State of California filed an action for injunctive relief to abate a public nuisance pursuant to Civil Code sections 3494, 3496, 3479, and 3480, as well as Code of Civil Procedure section 731, Penal Code section 11225 et seq., and Business and Professions Code section 17200 et seq. The complaint named as defendants D'Alessio, 10 businesses operating at the Property (A1 Oriental Massage, Inc., Angel Spa, Fantastic Spa, Rainbow Spa, Relax Zone, Super Day Spa, Inc., Visage Spa, Herban Elements, Inc., Illuminade, Inc., and Medmar Patient Care Collective), and 16 individuals affiliated with the businesses.

The complaint alleged that the Costa Mesa Police Department had initiated an investigation into the activities of massage establishments at the Property in July 2010, which resulted in the collection of evidence of prostitution at these establishments as well as a variety of other noncriminal municipal code violations. The complaint further alleged that several of the defendant businesses were distributing marijuana in violation of the Costa Mesa Municipal Code and these businesses had other non-marijuana-related violations of the municipal code.

*Preliminary Injunctions Granted*

The court issued a preliminary injunction against the massage establishments and individuals affiliated therewith on August 1, 2011.[2] These defendants were ordered to abate all conditions causing the nuisance at the Property and were enjoined from operating at or in any way using the Property during the pendency of the action. Moreover, the injunction prohibited the operation of any massage establishments at the Property. D'Alessio, however, was not named as defendant subject to this preliminary injunction.

---

[2] According to a declaration submitted by an attorney for the City, a temporary restraining order was issued on May 6, 2011, enjoining use of the Property by various businesses and enjoining "the operation of all massage establishments at the Property." This order is not in the record. Nor are the applications for injunctive relief and supporting evidence presumably filed by the City.

The court subsequently granted an application for preliminary injunction against the medical marijuana defendants on August 31, 2011 (the preliminary injunction was entered on Sept. 19, 2011). This injunction prohibited the sale, cultivation, possession, and distribution of marijuana at the Property. The defendants were ordered to abate all conditions causing the nuisance at the Property and were prohibited from occupying or using the Property during the pendency of the action. D'Alessio was named as defendant subject to this preliminary injunction. The court noted in its minute order: "As for the motion for preliminary injunction based on [D'Alessio's] leasing property to the medical marijuana dispensaries in violation of the City's ordinances, the application is granted. [D'Alessio] does not dispute that they knew that the medical marijuana dispensaries were operating as dispensaries, and are thereby subject to the provisions of the Costa Mesa ordinance."

*Cross-complaint*

On September 12, 2011, D'Alessio filed a cross-complaint against the City and five of its employees. The cross-complaint alleged the five employees made 11 oral statements about D'Alessio that amounted to slander, trade libel, and interference with prospective economic advantage. The cross-complaint did not specify the date on which any of the statements were allegedly made or the context in which they were made, other than to allege they had occurred within the past year. The cross-complaint alleged the statements were made with "malice, hatred and ill will."

George Nichols allegedly "told a prospective tenant of the Property that the Property has been raided by police from the City, and after the police documented the comings and goings at the Property and conducted surveillance there for over a year, they found illegal businesses operating there."[3]

Melynda Shank allegedly "told a prospective tenant at the Property that the City of Costa Mesa will not issue business licenses to anyone attempting to rent space at the Property because the City is in the middle of litigation with the owner of the Property due to illegal activity." Shank also allegedly "told a construction contractor that the City of Costa Mesa will not issue business licenses to anyone attempting to rent space at the Property because the City is in the middle of litigation with the owner of the Property due to illegal activity and that [Dennis D'Alessio] is the owner who is involved with such illegal activity at the Property." Shank also allegedly "told a construction contractor that Dennis D'Alessio has been arrested for prostitution and drug dealing that occurred at the Property."

---

[3] The cross-complaint underlines the alleged statements for emphasis, but we omit the underlining in this opinion for the sake of readability.

Willa Bouwens-Killeen allegedly "told a construction contractor that the City of Costa Mesa will not issue business licenses to anyone attempting to rent space at the Property because the City is in the middle of litigation with the owner of the Property due to illegal activity and that [D'Alessio] is the owner who is involved with such illegal activity at the Property." Bouwens-Killeen also allegedly "told a construction contractor that the City of Costa Mesa will not issue building permits to anyone attempting to perform works of improvement on or at the Property because [Dennis D'Alessio], the owner of the Property, is known throughout the City for doing illegal things at the Property."

Minoo Ashabi allegedly "told a prospective tenant at the Property that the City of Costa Mesa will not issue business licenses to anyone attempting to rent space at the Property because the City is in the middle of litigation with the owner of the Property due to illegal activity."

Mel E. Lee allegedly (1) "told a prospective tenant at the Property that Dennis D'Alessio has been convicted of prostitution and drug dealing that occurred at the Property"; (2) "told a prospective tenant at the Property that the Property is known for illegal activity including prostitution and drug dealing"; (3) "told a prospective tenant [at the Property] that the entire building at the Property is scheduled to be shut down because of illegal activity that is conducted there"; and (4) "told a prospective tenant at the Property that she should 'look at other buildings' because of the illegal activities being conducted at the Property."

*Anti-SLAPP Motion*

The City and the employees responded to the cross-complaint with an anti-SLAPP motion on November 3, 2011. Elena Q. Gerli, a deputy city attorney for the City, attested to several pertinent facts. "Pursuant to City Policy and the Costa Mesa Municipal Code, the City has never issued business licenses for the operation of medical marijuana dispensaries." "When the City's Complaint was filed on April 22, 2011, the City stopped issuing any new business licenses for the Property, if the requested business licenses concerned activities or operations related to the City's Complaint. This cessation of the issuance of business licenses for the Property was pursuant to the litigation concerning the Property." "Pursuant to [a temporary restraining order issued on May 6, 2011], the City ceased issuing for the Property any building permits or new business licenses relating to medical

marijuana or massage establishments . . . as ordered by the TRO. There is no City policy regarding not issuing other types of business licenses, nor has the City temporarily suspended or placed a moratorium on issuing other types of business licenses for the Property." "Prior to the April 22, 2011 filing by the City of the underlying lawsuit in this matter, I am personally aware that the City enacted a City-wide moratorium on the issuance of new business licenses for new massage establishments within the City."

The five employee cross-defendants signed declarations in support of the anti-SLAPP motion. All of the employees denied making the statements attributed to them in the cross-complaint. All of the employees denied bearing any malice, hatred, or ill will toward D'Alessio, or having any reason to do so.

Four of the employees recall some conversations concerning the Property. Mel E. Lee, a senior planner with the City, remembered a conversation he had with a tenant or prospective tenant of the Property in August 2011. This conversation occurred in the context of processing a city permit for the display of a banner at the Property. Lee "may have conversed with this individual about the issuance of City permits and/or City licenses for the Property."

George Nichols, a code enforcement officer, recalls having conversations with a representative of a medical marijuana dispensary at the Property. In this conversation, Nichols recalls mentioning that there was a temporary restraining order or preliminary injunction at the Property and that the dispensary should refrain from conducting unlawful operations within the City. Nichols also told a dispensary agent that the police had conducted searches at medical marijuana dispensaries within the City.

Willa Bouwens-Killeen, chief of code enforcement, may "have told someone that there are 'illegal improvements' at the Property." She also "informed a construction contractor that the City would not issue a building permit to perform plumbing repairs at one of the massage establishments located at the Property, because of the ongoing litigation. This individual became frustrated that he could not get a City permit to perform work which was enjoined by the [temporary restraining order]."

Minoo Ashabi, a senior planner, recalls a conversation with an individual about business licenses at the Property. Ashabi "accurately told the applicant the type of license which was being inquired about was presently not being

issued, and I believe I told the individual it was because of the litigation concerning the Property." "I do not recall whether I also told the applicant that licenses were not being issued because of 'illegal activity' at the Property."

*Opposition to Anti-SLAPP Motion*

Dennis D'Alessio submitted his own declaration in opposition to the anti-SLAPP motion. Other than denying he had ever been arrested or convicted of crimes, D'Alessio's declaration did not include material directly relevant to the allegations of slanderous statements in the cross-complaint (e.g., an assertion of personal knowledge as to the utterance of the alleged slanderous statements). D'Alessio stated at the end of his declaration that he has lost "some 6 prospective tenants" as a result of the slanderous statements alleged in the cross-complaint, which amounts to losses of "tens of thousands of dollars each month." Dennis D'Alessio also claimed "significant damage to [his] reputation."

D'Alessio also submitted declarations of individuals with professed knowledge pertaining to the allegations in the cross-complaint. Corina Simeone, who in the spring of 2011 discussed with D'Alessio the idea of leasing space at the Property to operate a tanning salon, visited the business and license division of the City on May 20, 2011. Melynda Shank directed Simeone to Minoo Ashabi. Ashabi "informed me that the City is not issuing any business licenses for anyone at this property location because 'there is illegal activity going on at that building and we will not process any business licenses for [the Property].' " Simeone did not lease space at the Property as a result of this statement. Thus, there is some evidence in the record that Ashabi made statements similar to those alleged in the cross-complaint.

Delores Cinquegrani "visited the offices of the City of Costa Mesa on April 29, 2011 to inquire about obtaining a business license for operation of a retail store [at the Property]." She "spoke with Mel E. Lee [who] informed me that the subject building had recently 'been raided' and that the police had been documenting for over a year the various comings and goings at this property, specifically, the massage parlors. He said that 'there [was] a lot of illegal businesses there, but that's another story; they have massage parlors and marijuana dispensaries and that's why the cops raided it. They've been investigated.' " Lee suggested Cinquegrani look at other buildings for her business.

Lad Wentzel negotiated with D'Alessio for office space at the Property in March 2011. Wentzel spoke to Mel E. Lee about procuring a business license. Lee "seemed to be less than enthusiastic about me leasing space at this property, and after I inquired as to why he . . . said, 'Dennis D'Alessio has recently been convicted of prostitution and drug dealing' and that 'the entire building is scheduled to be shut down shortly because of all the illegal activity carried on there.' " As a result, Wentzel secured space elsewhere. Between the Cinquegrani and Wentzel declarations, there is evidence in the record that Lee made statements similar to those alleged in the cross-complaint.

James Rash inquired into leasing space at the Property in September 2011. Rash visited the City zoning office and was told by an employee named Wendy Shih "that a small auto business such as that which I operate could not be operated at this property and that I would not be able to obtain a business license for" his proposed business, even though (according to Rash) such a business license should have been available. Shih encouraged Rash to find another location for his business and he did so. Shih is not mentioned in the cross-complaint and this allegation is not directly relevant to the tort allegations in the cross-complaint, although D'Alessio might contend it provides circumstantial support for the theory that the employees had actual malice and ill will toward D'Alessio.

Victor Jasniy, a licensed building contractor, agreed with D'Alessio to remodel the Property in 2009. After commencement of the work, a code enforcement inspector named Fidel Gamboa informed Jasniy that " 'the City has a lot of problems with Dennis D'Alessio' and he wanted to inspect the property before any construction was done 'because Dennis is known throughout the City for doing illegal things.' " Gamboa also told Jasniy to " 'be careful with Dennis and get your money up front.' " Jasniy also perceived "strange looks" and "whispering in the background" whenever he visited the City offices to pursue work for D'Alessio. Like the Rash declaration, the Jasniy declaration is not directly related to the particular allegations of slander/trade libel in the cross-complaint.

Richard D'Alessio (Dennis's brother and the owner of a food business at the Property) submitted a declaration in which he details alleged abuses of power (and general antipathy toward D'Alessio) by the employees, including Lee and Nichols. Richard D'Alessio's declaration does not include any information about the allegedly slanderous statements described in the cross-complaint.

D'Alessio provided no evidence that any of the alleged statements by Nichols, Shank, or Bouwens-Killeen were actually made.

*Ruling*

The court granted the anti-SLAPP motion with regard to cross-defendant Shank and with regard to cross-defendant Ashabi as to the slander and intentional interference with prospective economic advantage causes of action only. The court denied the anti-SLAPP motion with regard to the other cross-defendants (the City, Lee, Nichols, and Bouwens-Killeen). The cross-defendants appealed the order and D'Alessio cross-appealed.

## DISCUSSION

An order granting or denying a motion to strike under section 425.16 is appealable. (*Id.*, subd. (i); Code Civ. Proc., § 904.1, subd. (a)(13).) Our review of the court's order is de novo, and entails an independent review of the entire record. (*Ross v. Kish* (2006) 145 Cal.App.4th 188, 197 [51 Cal.Rptr.3d 484]; § 425.16, subd. (b)(2) ["court shall consider the pleadings, and supporting and opposing affidavits"].)

■ D'Alessio's cross-complaint is not what one might ordinarily think of as a SLAPP (e.g., a corporation suing to stop citizen groups from publicly opposing real estate development). But we note preliminarily that the anti-SLAPP law potentially applies to the speech of government employees (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 17 [92 Cal.Rptr.3d 286, 205 P.3d 207]; *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1115 [57 Cal.Rptr.2d 207]) and in the context of private conversations (*Averill v. Superior Court* (1996) 42 Cal.App.4th 1170, 1174–1175 [50 Cal.Rptr.2d 62]).

■ The anti-SLAPP statute "requires the court to engage in a two-step process. First, the court decides whether the [moving party] has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the [responding party] has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].)

The merits of D'Alessio's claims should play no part in the first step of the anti-SLAPP analysis. (*Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1388 [121 Cal.Rptr.3d 254].) The first step only determines whether section 425.16's *procedural* protection applies; the second step of the analysis addresses whether there is sufficient merit to the claims at issue to allow the litigation to proceed. (*Schaffer v. City and County of San*

*Francisco* (2008) 168 Cal.App.4th 992, 1004–1005 [85 Cal.Rptr.3d 880] (*Schaffer*).) The City and the employees cannot meet their threshold showing in step one by pointing to the lack of evidence that the statements were made, the truth of the alleged statements, or affirmative defenses. (See *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 284 [67 Cal.Rptr.3d 190]; *Freeman v. Schack* (2007) 154 Cal.App.4th 719, 733 [64 Cal.Rptr.3d 867].) Likewise, evidence that the alleged "statements were false does not determine whether they constitute protected activity for purposes of the SLAPP statute." (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1549 [110 Cal.Rptr.3d 129].)

*Step One of the Anti-SLAPP Analysis*

■ The first step of the anti-SLAPP analysis requires careful consideration of the statutory language in light of the legal theories of recovery, not a mere cataloging of claims or consideration of general principles of free speech. Courts look "not to First Amendment law but to the statutory definition set forth in section 425.16, subdivision (e)" when determining whether an anti-SLAPP motion may be brought against a cause of action. (*Schaffer, supra*, 168 Cal.App.4th at p. 1001.)

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike . . . ." (§ 425.16, subd. (b)(1).) As used in the anti-SLAPP statute, " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) *any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law*, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Id.*, subd. (e), italics added.)

In our view, D'Alessio's causes of action arise from oral statements "made in connection with an issue under consideration or review by a legislative, executive, or judicial body." (§ 425.16, subd. (e)(2).) Our analysis can be broken down into three components: (a) was there an "issue under consideration or review by a legislative, executive, or judicial body"; (b) were the employees' statements made "in connection with" this issue; and (c) did the

causes of action pleaded by D'Alessio "aris[e] from" the employees' statements?[4] (§ 425.16, subd. (e)(2), (b)(1).)

◼ First, was there an issue under consideration or review by a government body? "As used in section 425.16[, subdivision (e)(2)], a matter is 'under consideration' if it 'is one kept "before the mind", given "attentive thought, reflection, meditation." [Citation.] A matter under review is one subject to "an inspection, examination." ' " (*Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075, 1085 [70 Cal.Rptr.3d 614] (*Maranatha*).) The review or consideration process need not consist of official or formal proceedings. (*Ibid.*) In *Maranatha*, a private firm sued a state executive branch department based on alleged defamatory matter in a publicized letter (and subsequent oral comments by an employee) explaining the reasons the department was terminating its contract with the firm (i.e., the firm misappropriated funds). (*Id.* at pp. 1080–1082.) For purposes of evaluating the first step of the anti-SLAPP analysis under section 425.16, subdivision (e)(2), the *Maranatha* court rejected an argument that the department was not entitled to bring an anti-SLAPP motion because it had not instituted formal or official proceedings pertaining to the misappropriation allegations. (*Maranatha*, at p. 1085.)

At the time in question in the instant case, both an executive body (the City's government) and a judicial body (the trial court) were considering and reviewing the issue of whether illegal activity was occurring at the Property and what should occur as a consequence. The City, once injunctive relief issued from the court, formulated a policy of refusing to issue certain licenses at the Property. Both forms of review and consideration of the issue of illegal conduct at the Property qualify under section 425.16, subdivision (e)(2).

◼ The second question is whether the alleged statements of the City's employees were made "In connection with" the issue under review or consideration. In cases in which the only relevant governmental review or consideration of a private issue is a lawsuit, "a statement is 'in connection with' litigation under section 425.16, subdivision (e)(2) if it relates to the substantive issues in the litigation and is directed to persons having some interest in the litigation." (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266 [73 Cal.Rptr.3d 383].) The trial court in this case found that only

---

[4] "As the statute's plain language indicates, if the statement at issue falls within the ambit of [section 425.16,] subdivision (e)(1) or (2), defendants need not separately demonstrate that [the statements at issue] concerned an issue of public significance." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 111 [1 Cal.Rptr.3d 501].) Nor need we concern ourselves with whether the statements at issue occurred in a "place open to the public or a public forum." (§ 425.16, subd. (e)(3).)

alleged statements by Shank and Ashabi, which included the word "litigation," satisfied section 425.16, subdivision (e)(2), because only these statements were shown to be "made in connection with this litigation." But the statute asks whether the statements were "made in connection with an issue under consideration or review" by a branch of the government (*ibid.*), not whether the statements specifically referenced litigation. (See *Schaffer, supra*, 168 Cal.App.4th at pp. 999–1004 [written statements by police officer were made "in connection with" executive branch investigation; rejects claim that police officers merely "doing their job" are not entitled to SLAPP protection].)[5]

All of the allegedly slanderous communications referenced in the cross-complaint are based on employees in the planning department and code enforcement department communicating with parties interested in obtaining licenses at the Property. These parties seeking licenses at the Property were allegedly told they could not obtain licenses because of illegal activity at the Property. They were also allegedly told other details (some clearly inaccurate, such as Dennis D'Alessio being convicted of crimes). For purposes of this inquiry, it is irrelevant whether the alleged statements accurately described the litigation and concomitant executive body review of alleged criminal activity at the Property. It would unduly conflate the merits of D'Alessio's claim with the first step of the anti-SLAPP inquiry were we to distinguish between alleged statements accurately describing ongoing litigation or executive policy consideration and other less accurate statements. Regardless of whether these communications specifically referenced the litigation or accurately described the status of the litigation, each communication is connected to the issue of alleged·illegal activities at the Property *and* the executive body policy consequences of this issue for individuals seeking business licenses at the Property. (See *Maranatha, supra*, 158 Cal.App.4th at pp. 1081–1086 [written and oral statements about alleged misconduct by private firm were connected with executive branch consideration and review of an issue].)

■ Third and finally, did D'Alessio's causes of action arise from the alleged oral statements? The " 'arising from' " statutory requirement means "the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695].) In some instances, speech and petitioning activity is peripheral to the actual legal claim in the complaint. (See, e.g., *id.* at p. 80 [controversy not a

[5] The City and the employees phrase their argument in terms of "connection to the litigation" rather than connection to the issue under consideration by executive and judicial bodies. But the consideration of the issue by the two governmental bodies is inextricably intertwined because the executive body opted to pursue a lawsuit in a judicial body to address the issue.

SLAPP because dispute concerned validity of city ordinance, not protected activity related to the city ordinance]; *Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, 808–810 [63 Cal.Rptr.3d 575] ["overall thrust" of complaint took aim at alleged private business misdeeds rather than "collateral activity of pursuing governmental approvals"].) But that is not the case here. D'Alessio is suing for slander, trade libel, and intentional interference with prospective economic advantage, all based on the allegation that the five employees made 11 statements about D'Alessio and the Property resulting in economic harm to D'Alessio. (See *People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1317 [9 Cal.Rptr.3d 844] ["archetype" SLAPP actions involve "torts of defamation or intentional interference with economic advantage"].) D'Alessio is suing for relief based on the oral statements, not challenging the underlying acts (the refusal of the City and its employees to issue licenses).

In sum, D'Alessio's cross-complaint is subject to an anti-SLAPP motion. We turn to the second step of the anti-SLAPP analysis to evaluate D'Alessio's probability of prevailing on the slander, trade libel, and intentional interference causes of action.

*Step Two of the Anti-SLAPP Analysis: Probability of Prevailing*

■ "[A]lthough by its terms section 425.16, subdivision (b)(1) calls upon a court to determine whether 'the plaintiff has established that there is a *probability* that the plaintiff will prevail on the claim' (italics added), past cases interpreting this provision establish that the Legislature did not intend that a court, in ruling on a motion to strike under this statute, would weigh conflicting evidence to determine whether it is more probable than not that plaintiff will prevail on the claim, but rather intended to establish a summary-judgment-like procedure available at an early stage of litigation that poses a potential chilling effect on speech-related activities." (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714 [54 Cal.Rptr.3d 775, 151 P.3d 1185].) "[T]he court's responsibility is to accept as true the evidence favorable to the plaintiff . . . ." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786].) "[T]he defendant's evidence is considered with a view toward whether it defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element." (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 585 [132 Cal.Rptr.2d 789].)

■ "Slander is a form of defamation (Civ. Code, § 44), consisting of a false and unprivileged oral publication (Civ. Code, § 46). To establish a prima facie case for slander, a plaintiff must demonstrate an oral publication to third persons of specified false matter that has a natural tendency to injure or that

causes special damage." (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 106 [15 Cal.Rptr.3d 215].) ▮ "Trade libel is the publication of matter disparaging the quality of another's property, which the publisher should recognize is likely to cause pecuniary loss to the owner. [Citation.] The tort encompasses 'all false statements concerning the quality of services or product of a business which are intended to cause that business financial harm and in fact do so.' [Citation.] [¶] To constitute trade libel, a statement must be false." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010 [113 Cal.Rptr.2d 625].)

▮ Interference with prospective economic advantage consists of "(1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) an intentional · act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act, including an intentional act by the defendant that is designed to disrupt the relationship between the plaintiff and a third party." (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 944 [81 Cal.Rptr.3d 282, 189 P.3d 285].) The intentional act at issue must be "independently wrongful." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1158 [131 Cal.Rptr.2d 29, 63 P.3d 937].) Here, the alleged independently wrongful conduct was the oral publication of false information about D'Alessio and the Property.

▮ D'Alessio provided *no* evidence to support allegations in the cross-complaint that Nichols, Shank, or Bouwens-Killeen made the statements alleged in the cross-complaint. Nor does D'Alessio even argue that the statements admitted to by Nichols and Bouwens-Killeen in their declarations were false or otherwise wrongful. In the second step of the anti-SLAPP analysis, "the plaintiff must show . . . there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment." (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 108 [64 Cal.Rptr.3d 467].) "The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence." (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017 [85 Cal.Rptr.3d 838].) Thus, D'Alessio does not have a probability of prevailing against Nichols, Shank, or Bouwens-Killeen and the anti-SLAPP motion must be granted in its entirety as to these three cross-defendants.[6]

---

[6] This result was only avoided at the trial court with regard to Nichols and Bouwens-Killeen because the court found they had not met their threshold burden of showing that the causes of action against them were subject to an anti-SLAPP motion.

D'Alessio's declarations provide support for the conclusion that Minoo Ashabi and Mel Lee made the statements alleged in the cross-complaint. Ashabi allegedly told a prospective tenant that business licenses were not being issued at the Property because of illegal activity occurring at the Property.[7] Lee allegedly told two prospective tenants about illegal activity at the Property in the context of those prospective tenants attempting to procure business licenses. Lee also indicated the police had "raided" the Property and documented wrongdoing at the massage parlors and marijuana dispensaries at the Property. Lee allegedly told one of the prospective tenants to look elsewhere for property to lease because the Property would be shut down. Lee also allegedly told one of the prospective tenants that Dennis D'Alessio had been convicted of prostitution and drug dealing, a clearly inaccurate statement.

■ The question, then, is whether Ashabi's and Lee's alleged statements are actionable against the City, Ashabi, and/or Lee. The tort liability of public entities like the City[8] is "statutory in nature." (*Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 809 [205 Cal.Rptr. 842, 685 P.2d 1193]; see Gov. Code, § 815 [public entities are not liable for injuries "[e]xcept as otherwise provided by statute"].) ■ "Under California law, a public entity may be held vicariously liable for the conduct of its employees acting within the scope of their employment, but *only* to the extent that the employees may be held liable." (*Nadel v. Regents of University of California* (1994) 28 Cal.App.4th 1251, 1259 [34 Cal.Rptr.2d 188]; see Gov. Code, § 815.2, subd. (a).) "The liability of a public entity . . . is subject to any immunity of the public entity provided by statute . . . and is subject to any defenses that would be available to the public entity if it were a private person." (Gov. Code, § 815, subd. (b).)

■ Extant case law supports the general proposition that a public entity and its employees may (in appropriate circumstances) be held liable for slander. (See, e.g., *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 409–410 [134 Cal.Rptr. 402, 556 P.2d 764] [affirming jury verdict against public entity and its clerk for defamation arising out of clerk's comment to newspaper that plaintiff procured money from clerk by means of " 'a real con job' "]; *Nadel v. Regents of University of California, supra,* 28 Cal.App.4th at pp. 1254–1255, 1260–1261 [in holding constitutional "malice" standard applicable in defamation action brought by limited public figures against a public entity and its employees, court suggests that in at least some cases, "no statutory privilege or immunity" applies to government speech made by

---

[7] The cross-complaint alleges that Ashabi referenced litigation concerning such illegal activity, whereas the declaration does not mention Ashabi referring to the litigation. This difference in phrasing does not affect our analysis.

[8] " 'Public entity' includes . . . a . . . city . . . and any other political subdivision or public corporation in the State." (Gov. Code, § 811.2.)

employee within scope of employment].) It is also possible for a public entity and its employees to be held liable for intentional interference with prospective economic advantage and trade libel. (*H & M Associates v. City of El Centro* (1980) 109 Cal.App.3d 399, 405–409 [167 Cal.Rptr. 392] [cause of action for intentional interference with contractual relationships survives demurrer despite assertion of various immunities and privileges]; *ECO Resources, Inc. v. City of Rio Vista* (E.D.Cal., July 17, 2006, No. 2:05-cv-2556-GEB-DAD) 2006 U.S.Dist. Lexis 52373 [city can be liable for trade libel based on conduct of employees].)

It is uncontested for purposes of this appeal that Ashabi and Lee were acting within the scope of their employment when they allegedly uttered the statements at issue. The question before us is whether various defenses, privileges, and immunities preclude liability for Ashabi, Lee, and/or the City under the circumstances of this case.[9] We discuss each of cross-defendants' theories in turn.[10]

### 1. D'Alessio Failed to Prove Ashabi's Statement Was False

 Cross-defendants first contend Ashabi's statement and most of Lee's statements were true and therefore not actionable. "In defamation actions generally, factual truth is a defense which it is the defendant's burden to prove. [¶] In a defamation action . . . by a private person suing over statements of public concern, however, the First Amendment places the burden of proving falsity on the *plaintiff.*" (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1382 [88 Cal.Rptr.2d 802] [newspaper defendant]; see *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 375 [54 Cal.Rptr.2d 781] (*Nizam-Aldine*) [same rule applies to nonmedia defendants].) "Unlike personal defamation, the plaintiff seeking damages for trade libel must . . . carry the burden of proving that the disparaging statement is false . . . ." (*Guess, Inc. v. Superior Court* (1986) 176 Cal.App.3d 473, 479 [222 Cal.Rptr. 79].)

If the truth of the employees' statements were an affirmative defense to D'Alessio's causes of action, the cross-defendants' argument on appeal would have no merit. The cross-defendants point to the unverified complaint and the

---

[9] The court found that D'Alessio had not established a probability of prevailing as to Ashabi with regard to the slander and intentional interference causes of action because of a lack of evidence presented that (1) Ashabi's statement reflected on D'Alessio (rather than simply reflecting something about the Property) and (2) Ashabi was aware of an existing relationship between D'Alessio and attesting witness, Simeone (the prospective tenant at the Property). Because we conclude below that none of the causes of action are viable against Ashabi for another reason, we need not address the court's reasoning.

[10] We address only those defenses, immunities, and privileges raised by cross-defendants in their anti-SLAPP motion and appellate briefs.

issuance of preliminary injunctions to support their claim that the statements about illegal conduct at the Property were true. The cross-defendants did not submit any admissible evidence that illegal activity was occurring at the Property. Thus, cross-defendants are far from establishing the truth of any of the statements as a matter of law.

But "[t]he First Amendment trumps the common law presumption of falsity in defamation cases involving private-figure plaintiffs when the allegedly defamatory statements pertain to a matter of public interest." (*Nizam-Aldine, supra,* 47 Cal.App.4th at p. 375.) In *Nizam-Aldine,* a dispute arose when a property owner sought to develop several lots. (*Id.* at pp. 368–369.) The City of Oakland employees made derogatory statements about the boundary survey work performed by two private civil engineers, e.g., the survey was " 'either fabrication or fraud' "; the survey was " 'screwed up' or 'fucked up' " (*id.* at pp. 370–371); surveys were " 'fraudulent' or 'fabricated' "; and the survey was " 'incorrect' and 'not acceptable' " (*id.* at p. 372). These statements were made to various interested members of the public (e.g., the civil engineers themselves, a neighbor who disapproved of the development, a contractor working at the site, a potential buyer at the site, and a real estate broker who worked with one of the engineers). (*Id.* at pp. 370–372.)

The *Nizam-Aldine* trial court committed reversible error by instructing the jury that the defendants had the burden of proving the truth of the employees' statements. (*Nizam-Aldine, supra,* 47 Cal.App.4th at pp. 372, 379–381.) "All five statements at issue . . . were responses by . . . employees to direct requests for information about a matter the City [of Oakland] was involved in by virtue of its exercise of a governmental function. Further, the speakers did not just so happen to be employed by the City [of Oakland]. [Oakland] officials were sought out and asked by members of the public to explain and/or justify why the City [of Oakland] exercised its discretionary power to stop work at the private construction sites. These inquiries and the . . . responses were 'discussion[s] of governmental affairs'; the freedom of such discussion is protected by the First Amendment. [Citation.] Indeed, all of the statements at issue in this case were not only made by government officials, but related directly to a matter with which the speakers had become involved *qua* representatives of local government." (*Id.* at pp. 376–377, fn. omitted.) A contrary result would vitiate government's role of informing the public about important matters. (*Id.* at pp. 377–379.)

Here, the employees' statements were made on a matter of public interest because they came in the context of potential tenants and contractors requesting licenses for activity at the Property. In the course of explaining why licenses could not issue, Ashabi and Lee allegedly made false statements about the Property and (in Lee's case) D'Alessio. Alleged illegal activity at

the Property was a matter of public interest because the City investigated businesses at the Property, filed a public nuisance lawsuit, and devised policies with regard to the issuance of licenses and permits at the Property. Because these statements concerned a matter of public interest, the falsity of the statements is an element in the slander cause of action alleged by D'Alessio. Moreover, falsity is an element of the trade libel cause of action regardless of whether a matter of public interest is under review. And proving wrongful conduct is D'Alessio's burden with regard to the intentional interference cause of action.

D'Alessio did not meet his burden of proving a probability of prevailing with regard to Ashabi's alleged statement. (See *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 529–531 [44 Cal.Rptr.3d 517] [plaintiff did not make probability-of-prevailing showing of falsity with regard to matter of public interest]; *ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th at pp. 1010–1014 [plaintiff did not make probability-of-prevailing showing of falsity for purposes of trade libel cause of action].) No declarations from individuals with personal knowledge of the massage establishments' practices were submitted. Although D'Alessio nit-picks at the City's procedures and hypothesizes that certain city employees dislike him, no evidence was submitted disproving the existence of illegal activity at the Property. For instance, D'Alessio states that in 2010 a police officer told him the Property was " 'full of prostitutes' " but complains the officer did not identify the specific massage businesses about which he was referring. Accepting this evidence (and similar evidence presented by D'Alessio) as true does nothing to establish the falsity of Ashabi's alleged statement. With regard to Ashabi's statement, the issue is not whether D'Alessio was on actual notice of specific illegal activity; the issue is whether illegal activity occurred at the Property.

Lee's alleged statement about Dennis D'Alessio's criminal convictions is different in kind. Dennis D'Alessio attested he "has never been arrested or convicted of anything," a fact conceded by cross-defendants on appeal. Thus, D'Alessio submitted sufficient evidence to demonstrate the falsity of Lee's key alleged statement for purposes of the anti-SLAPP motion.[11] We will focus exclusively on Lee and his alleged false statements for the remainder of the opinion.

---

[11] Of course, some of what Lee said might well be true and therefore nonactionable, but the key allegation against Lee pertains to a statement that is clearly untrue. Dennis D'Alessio met his anti-SLAPP burden with regard to the elements of his three causes of action against Lee and the City (vicariously liable for Lee's statements).

## 2. Cross-defendants Failed to Establish Lee's Statements Were Protected by the Litigation Privilege

 The City and Lee next contend the litigation privilege precludes liability for Lee's statements. "The [litigation] privilege in [Civil Code] section 47 is 'relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense plaintiff must overcome to demonstrate a probability of prevailing.' " (*Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 38 [64 Cal.Rptr.3d 348].)

 " 'The litigation privilege, codified at Civil Code section 47, sub-division (b), provides that a "publication or broadcast" made as part of a "judicial proceeding" is privileged. This privilege is absolute in nature, applying "to *all* publications, irrespective of their maliciousness." [Citation.] "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action." [Citation.] The privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." [Citation.] [¶] "The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." ' " (*Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 766 [90 Cal.Rptr.3d 181].) The litigation privilege "immunizes defendants from virtually any tort liability . . . with the sole exception of causes of action for malicious prosecution." (*Olsen v. Harbison* (2010) 191 Cal.App.4th 325, 333 [119 Cal.Rptr.3d 460].)

By way of relevant summary, Lee, a senior planner with the City, allegedly told an individual interested in a business license to operate at the Property that (1) Dennis D'Alessio had been convicted of prostitution and drug dealing and (2) the Property would be shut down because of illegal activity. This case does not involve statements made in a judicial or other official proceeding. Nor does it involve statements made to initiate an investigation or official action. Nor does it involve attorneys or parties describing the litigation to other parties or attorneys involved in the litigation.

Cross-defendants contend, however, that Lee's statements were connected to the litigation because they refer (however inaccurately) to the issue of illegal activity at the Property and the litigation goals of the City in the underlying nuisance action. Lee's statements were arguably made in tangen-tial pursuit of the goals of the litigation (eliminating the nuisance at the Property).

■ "The ' "connection or logical relation" which a communication must bear to litigation in order for the privilege to apply, is a functional connection,' i.e., the communication must 'function as a necessary or useful step in the litigation process and must serve its purposes.' [Citation.] The test 'cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation,' including vindication in the court of public opinion. [Citation.] Instead, the 'connection or logical relation' prong of the test 'can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case.' " (*Sharper Image Corp. v. Target Corp.* (2006) 425 F.Supp.2d 1056, 1078.) "The privilege for statements made in a 'judicial proceeding' does not apply to statements made outside of the courtroom to nonparties unconnected to the proceedings." (*Begier v. Strom* (1996) 46 Cal.App.4th 877, 882 [54 Cal.Rptr.2d 158].)

Cross-defendants failed to establish as a matter of law that the litigation privilege applied to Lee's statements. Cross-defendants did not establish in their anti-SLAPP motion or appellate briefs that Lee's communications functioned to advance the City's nuisance action. Nor did cross-defendants cite any cases applying the litigation privilege in comparable circumstances.

### 3. *Cross-defendants Failed to Establish Prosecutorial Immunity*

■ The City and Lee also claim prosecutorial immunity. "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." (Gov. Code, § 821.6.) Although this immunity should be interpreted broadly for investigatory and prosecutorial conduct (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1048 [55 Cal.Rptr.3d 158]), we are not convinced by the record presented that Lee's statements were made in the course of prosecutorial or investigative duties. We reject this argument.

### 4. *Cross-defendants Failed to Establish Immunity for Misrepresentations*

■ Finally, the City and Lee cite governmental immunities for "misrepresentations." "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional." (Gov. Code, § 818.8.) "A public employee acting in the scope of his employment is not liable for an injury caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is guilty of actual fraud, corruption or actual malice." (Gov. Code, § 822.2.) "Government Code section 818.8 provides an immunity to public entities for misrepresentations and section 822.2

provides an immunity for public employees for misrepresentations." (*Adkins v. State of California* (1996) 50 Cal.App.4th 1802, 1818 [59 Cal.Rptr.2d 59], disapproved on other grounds in *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1156–1158 [77 Cal.Rptr.2d 445, 959 P.2d 752].)

The word "misrepresentation" under Government Code sections 818.8 and 822.2 "potentially lends itself to extremely expansive and elusive interpretations." (*Johnson v. State of California* (1968) 69 Cal.2d 782, 799 [73 Cal.Rptr. 240, 447 P.2d 352].) To avoid "this potential quagmire," our Supreme Court has interpreted " 'misrepresentation' " to apply only to "interferences with financial or commercial interest[s]" arising out of the common law concept of deceit. (*Id.* at p. 800 [rejecting argument that government was immune for claim related to the provision of inaccurate information about foster child].) " 'Misrepresentation' " does not include "the general milieu of negligent and intentional wrongs . . . ." (*Ibid.*) "California law recognizes several categories of fraud and deceit, including negligent and intentional misrepresentation. [Citations.] The courts have assumed that the immunity includes all types of fraud and deceit cases including fraudulent concealment." (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 867 [247 Cal.Rptr. 504], fn. omitted.) "Court of Appeal cases which have held that [Government Code] section 818.8 provided immunity concern interferences with financial or commercial interests, including the issuance of permits or licenses." (*Id.* at p. 870.)

Here, the gist of D'Alessio's cross-complaint is that city employees provided inaccurate information to *third parties* and, in doing so, harmed D'Alessio. It is undisputed that this case concerns the issuance of permits or licenses. It is also true this case involves alleged misstatements of fact that purportedly harmed D'Alessio's financial interests. But this case does not involve "misrepresentations" as defined by our Supreme Court. Tort causes of action based on reputational harm (slander, trade libel, and intentional interference based on false statements to third parties) are not included within the "deceit" rubric identified by our Supreme Court when it interpreted Government Code sections 818.8 and 822.2. (*ECO Resources, Inc. v. City of Rio Vista, supra*, 2006 U.S.Dist. Lexis 52373; *ECO Resources, Inc. v. City of Rio Vista* (E.D.Cal., Apr. 12, 2006, No. 2:05-cv-2556-GEB-DAD) 2006 U.S.Dist. Lexis 100339, p. *7 ["The torts of trade libel and defamation are not encompassed by [Government Code] section 818.8 because they involve reputational harm for which the legislature did not intend to grant immunity."].) We therefore reject cross-defendants' argument.

In sum, the evidence presented by cross-defendants in their anti-SLAPP motion does not establish the applicability as a matter of law of any of the defenses, privileges, and immunities put forth so as to result in dismissal of the cross-complaint with regard to Lee and the City.

## DISPOSITION

The court's order is affirmed in part and reversed in part. On remand, the court is instructed to grant the City's anti-SLAPP motion in its entirety as to cross-defendants George Nichols, Willa Bouwens-Killeen, and Minoo Ashabi.

The court correctly granted the anti-SLAPP motion in its entirety as to cross-defendant Melynda Shank. The court also correctly denied the anti-SLAPP motion as to cross-defendants Mel E. Lee and the City. In the interests of justice, the parties shall bear their own costs on appeal.

Fybel, Acting P. J., and Thompson, J., concurred.

A petition for a rehearing was denied April 4, 2013, and the petition of appellant City of Costa Mesa for review by the Supreme Court was denied May 22, 2013, S210098.